**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| MICHAEL MCINTOSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-00099-JMS-MJD |
| | ) | |
| CORIZON, | ) | |
| INDIANA DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Corizon's Motion for Summary Judgment and**
**Denying Indiana Department of Correction's Motion for Summary Judgment**

Plaintiff Michael McIntosh, a former Indiana state prisoner, alleges that employees of the Indiana Department of Correction ("IDOC") and Corizon, Inc. ("Corizon") failed to accommodate his disability. They allegedly failed to provide him with a portable oxygen tank and wheelchair after he was transferred to Wabash Valley Correctional Facility ("Wabash Valley"). As a result, Mr. McIntosh spent the majority of his time confined to his prison cell or within its immediate vicinity, in order to stay close to his oxygen concentrator. This restricted Mr. McIntosh's opportunities to participate in recreation, attend church services, or visit the law library. His claims are brought under the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[1]

---

[1] The parties' briefing is limited to consideration of Title II of the ADA. There is no reason for this Court to expand the scope of the parties' analysis.

Each defendant seeks resolution of the claims alleged against it through summary judgment. The plaintiff has opposed these motions.[2] For the reasons explained below, Corizon's motion for summary judgment, dkt [230], is **granted** and the IDOC's motion, dkt [229], is **denied.**

## I.
## Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011). The key inquiry, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999).

"The applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson,* 477 U.S. at 248).

---

[2] The Court thanks attorney Christopher S. Stake for accepting the Court's request to represent Mr. McIntosh in this action. This case presents important legal issues and Mr. Stake's excellent legal research and presentation gives this Court confidence that it has fully considered Mr. McIntosh's claims on the merits. A cursory review of the record prior to Mr. Stake's appearance reflects how valuable his assistance has been in moving this case towards resolution.

**II.**
**Statement of Facts**

Applying the standards set forth above, the following statement of facts give Mr. McIntosh, as the non-moving party, the benefit of all reasonable inferences.

IDOC is the State agency in charge of operating Indiana's correctional facilities. IDOC receives federal funding. Prior to April of 2017, IDOC contracted with Corizon to provide medical services to inmates incarcerated at its correctional facilities.

Mr. McIntosh has multiple medical conditions that affect his breathing, including chronic obstructive pulmonary disease ("COPD"), emphysema, and asthma. Prior to his 2012 incarceration, Mr. McIntosh had surgery to remove his right lung due to lung cancer.

**A. Putnamville Correctional Facility**

On May 23, 2012, Nurse Practitioner Jennifer A. Barnes examined Mr. McIntosh and noted that he was oxygen dependent and "has increased work of breathing with ANY activity." Dkt. 2-2 at 15 (emphasis in original). While incarcerated at Putnamville Correctional Facility, Mr. McIntosh's breathing started getting louder and louder. The medical staff sent him to the hospital.

**B. New Castle Correctional Facility**

A couple of days later, Mr. McIntosh was transferred to New Castle Correctional Facility. Mr. McIntosh's breathing kept getting worse. Mr. McIntosh could not walk very far without his oxygen levels dropping. On August 13, 2012, within 90 days of arriving at New Castle Correctional Facility, a doctor ordered a portable oxygen tank for Mr. McIntosh after reading his oxygen levels. Two weeks later, Mr. McIntosh received a wheelchair after a doctor ordered it for him.

The portable oxygen tank was an oval shaped, one-and-a-half foot tall refillable tank. It

3

had a strap on it so Mr. McIntosh could carry it. It weighed 6-8 pounds. Mr. McIntosh stayed on oxygen continuously, either by using his portable tank, or an oxygen concentrator which was stationed next to his bed. When Mr. McIntosh needed his oxygen tank refilled, he would take it to the medical staff and they would refill it and give it back to him. Initially, Mr. McIntosh could walk from his bed to the dining hall without oxygen, but eventually reached a point where he couldn't walk to the dining hall, which necessitated the wheelchair. Mr. McIntosh used the wheelchair 90 percent of the time. Periodically, Mr. McIntosh attempted to test himself by walking without oxygen, but his breathing was getting progressively worse.

## C. Wabash Valley Correctional Facility

Mr. McIntosh was transferred to Wabash Valley on February 8, 2013. Mr. McIntosh was physically transported in a van. IDOC took Mr. McIntosh out of his wheelchair to seat him in the van. The wheelchair stayed at New Castle. Mr. McIntosh kept his portable oxygen tank while the van was in transit. When Mr. McIntosh arrived at Wabash Valley, one of the officers said that he had to take the portable oxygen tank with him back to New Castle, and he did. Mr. McIntosh was immediately taken to the hospital at Wabash Valley, where he received an oxygen concentrator.

Mr. McIntosh's oxygen concentrator was placed in his cell. An oxygen concentrator uses air to make oxygen for the patient and plugs into the wall and has tubing and a nasal cannula attached for the patient to breathe in the oxygen. The tube is approximately 5 feet long.

The concentrator was rectangular and about two-and-a-half feet long, two-and-a-half feet high, and a-foot-and-a-half wide. It had four wheels but no handle. The concentrator weighed approximately 45 pounds. Mr. McIntosh attempted to move the oxygen concentrator, but he could not carry it. Mr. McIntosh tried to grab it by the cord and pull on it, but officers told him not to

4

move it that way. Mr. McIntosh could only take the concentrator to places where it could be plugged in. If it was not plugged in within a minute of being moved, Mr. McIntosh would run out of air.

At Wabash Valley, Mr. McIntosh was enrolled in the Chronic Care Clinic, which means he was seen by a medical provider every 90 days for his chronic conditions. A provider is either a doctor or nurse practitioner. When Mr. McIntosh was taken to the infirmary for his appointments, an IDOC guard would take him there in a wheelchair with a portable oxygen tank. Dkt. 236-2 at p. 47.

**D. Requests for Accommodation**

To request health care, inmates at Wabash Valley were required to fill out a Heath Care Request Form and put it in a box to be reviewed by medical staff. Mr. McIntosh submitted multiple Health Care Request Forms and grievances requesting a portable oxygen tank and/or wheelchair.

*March 24, 2013*

On March 24, 2013, Mr. McIntosh filled out a Health Care Request Form seeking a portable oxygen tank. Dkt. 2-2 at 17. Mr. McIntosh wrote that he needed an oxygen source that he could take outside for recreation and whenever he needed to go somewhere. He wrote that he was told that he could not pull the oxygen concentrator by its cord, but that he had no other way of carrying it. He wrote that he could not help that he was handicapped, but wished he could. He also wrote that he had not eaten since Saturday because he could not carry the oxygen concentrator and that he did not want a write-up. Marla Gadberry, R.N., responded to Mr. McIntosh's request. Nurse Gadberry wrote that Mr. McIntosh could take his oxygen concentrator out of his cell as needed and plug it into the day room.

*December 7, 2013*

On December 7, 2013, Mr. McIntosh submitted another Health Care Request Form. Mr. McIntosh wrote that he needed a portable air tank so that he could go to outside recreation, the gym, and to church if he wanted to go. Dkt. 236-1 at 17.

Amy Wright, R.N., responded to Mr. McIntosh's request. Nurse Wright responded that Mr. McIntosh's oxygen was "ordered only as needed," and that he didn't have to "wear it all the time." When Nurse Wright received Mr. McIntosh's request, she looked up Mr. McIntosh's oxygen orders in the computer. She did not do anything else. Mr. McIntosh's order for a portable oxygen tank at New Castle Correctional Facility did not show up in Wabash Valley's computer records. Nurse Wright's response was entirely based on her review of the computer records, and not any personal observations of Mr. McIntosh.

In order for Mr. McIntosh to receive a portable oxygen tank or wheelchair, it needed to be ordered by a doctor or nurse practitioner. At her deposition, Nurse Wright did not recall considering speaking with a doctor about Mr. McIntosh's request for a portable oxygen tank. Nurse Wright did not recall telling Mr. McIntosh that she could not order one for him, that any other nurse could not order one for him, or that he needed to schedule an appointment with a physician.

*December 31, 2013*

On December 31, 2013, Mr. McIntosh filed an offender grievance. IDOC denied his grievance on February 14, 2014, stating that "[t]he doctor has not ordered a portable Oxygen tank" for Mr. McIntosh. Dkt. 229-1. Mr. McIntosh appealed the denial of his grievance on February 27, 2014. Dkt. 229-1 at 13. Mr. McIntosh wrote that he had a wheelchair and portable oxygen tank at New Castle Correctional Facility, and that he had a doctor's order for them. *Id*. He wrote that the

only time that he received those items at Wabash Valley was when he would go to the infirmary, but they would not let him keep them when he returned to his cell. *Id*. He stated that without a wheelchair and portable air tank he cannot go to church, recreation or the library.

On March 5, 2014, IDOC denied Mr. McIntosh's appeal. Dkt. 229-1 at 28. This formal denial was written by Esther Hinton, the Medical Contract Monitor for IDOC. She wrote, "I have reviewed your file and do not see an Order for portable oxygen. Your file does not reflect you submitting healthcare request needing oxygen. An order for wheelchair from over a year ago can be reevaluated and stopped even with transfer to a different facility if you are not using or non-compliant with the treatment plan or documented safety issues." *Id*. There is no evidence that Mr. McIntosh was not compliant with any treatment plan relating to his wheelchair and Mr. McIntosh did, in fact, submit requests for health care seeking a portable oxygen tank prior to his grievance. Dkt. 2-2 at 17-19.

*January 24, 2014*

On January 24, 2014, Mr. McIntosh filed grievance number 81102 stating, in relevant part, "I was told by Officer McGowen that Nurse Neighbors told h[i]m the reason I don't have a portable air supply is cause I beat someone up with the one I had at [New Castle Correctional Facility]. That is a lie and she knows it is . . . ." Dkt. 229-1 at 31. Mr. McIntosh's grievance was referred to Travis Davis, Zone 1 Supervisor for his response. The response was as follows: "Custody has no decision on whether you are allowed a medical device. That decision is made by the medical department." Dkt. 229-1 at 36. Mr. McIntosh's grievance was denied.

*June 20, 2014*

Mr. McIntosh filed this lawsuit on April 2, 2014. On June 20, 2014, Mr. McIntosh had an appointment with Neil Martin, M.D., a physician for Corizon at Wabash Valley. Dr. Martin was aware of Mr. McIntosh's lawsuit against IDOC, although he does not recall how he learned that information. Dr. Martin evaluated Mr. McIntosh for purposes of determining whether to order a portable oxygen tank and wheelchair for him. Mr. McIntosh's pending lawsuit had no impact on Dr. Martin's evaluation. Dr. Martin observed Mr. McIntosh while he was on supplemental oxygen, then observed him without it. Dr. Martin documented his oxygen saturation to be 99% with supplemental oxygen. After Dr. Martin removed the oxygen, Mr. McIntosh remained seated without moving for 15 minutes. His oxygen saturation dropped to 89% in those fifteen minutes. Dr. Martin asked Mr. McIntosh to take several deep breaths. Dr. Martin observed that the deep breaths made Mr. McIntosh's wheezing worse, rather than making the wheezing go away. This indicated to Dr. Martin that Mr. McIntosh "definitely had organic lung disease." Dkt. 236-3 at 21. Dr. Martin ordered Mr. McIntosh a portable oxygen tank because Mr. McIntosh "demonstrated that he actually had the need for it" and "desaturated with no activity." *Id.* at 23. Dr. Martin ordered Mr. McIntosh a wheelchair because if Mr. McIntosh had been expected to walk "any distance at all," it would desaturate his oxygen more than he had desaturated with zero exertion. *Id.* at 23. It was reasonable, in Dr. Martin's opinion, to provide Mr. McIntosh with a portable oxygen tank and wheelchair. Dr. Martin did not know why Mr. McIntosh did not have a portable oxygen tank or wheelchair at Wabash Valley prior to that date, and was aware of no medical reason why he did not receive one earlier. *Id.* at 23-24.

Mr. McIntosh received a portable oxygen tank at Wabash Valley shortly after his visit with Dr. Martin. He had the oxygen tank for approximately four weeks before he was transferred to Plainfield Correctional Facility, sometime between July 3, 2014 and July 29, 2014.

Mr. McIntosh did not receive a wheelchair at any time at Wabash Valley.

Mr. McIntosh received a portable oxygen tank and wheelchair at Plainfield Correctional Facility.

**E. Services and Programming**

While at Wabash Valley, Mr. McIntosh missed out on going outside for recreation where he could get fresh air and sit in the grass. While other inmates were outside, Mr. McIntosh would lie in his cell watching TV. After he received the portable oxygen tank, Mr. McIntosh went to the day room where he could sit and socialize with other people, and it helped him a lot to just to get out of his cell.

Mr. McIntosh wanted to go to church a few times because he thought he was going to die. Mr. McIntosh attempted to go, but the door would close by the time he got up, and the guard told him he was too late. Mr. McIntosh wanted to go to the law library, but the law librarian told him to request what he needed and they would send the materials to him. Mr. McIntosh complied with this arrangement, but wanted the opportunity to physically go to the library himself, sit down, and read a book. By the time Mr. McIntosh got his portable oxygen tank, all his legal work had been completed, so he did not need to go to the law library anymore.

After Mr. McIntosh received a portable oxygen tank at Wabash Valley, he did not attend religious services. He also did not go outside for recreation, but just walked to the microwave in his dorm and would sit and talk with guys in the day room. Mr. McIntosh acknowledges that he

would not have done any recreational activities, but he just wanted to sit and breathe fresh air. He was never provided a wheelchair.

Mr. McIntosh is currently not incarcerated within the IDOC.

**F. Corizon**

Corizon is responsible for assigning wheelchairs, portable oxygen tanks, and other assistive devices. The only way Mr. McIntosh would receive a portable oxygen tank or wheelchair while at Wabash Valley was if it was ordered from a Doctor or Nurse Practitioner at that facility.

Corizon does not have a corporate policy governing when a patient can receive a wheelchair, portable oxygen tank, or other assistive breathing device. Whether a patient receives one of these devices is up to the discretion of the individual medical provider at the prison, i.e. the doctor or nurse practitioner. If the provider thinks that the patient requires a wheelchair, oxygen tank, or assistive breathing device, then the provider can order that device for the patient. Corizon does not provide the prison's religious activities or recreation. Corizon's sole function at the prison is to provide medical services.

### III.
### Discussion

Mr. McIntosh claims that Corizon and IDOC discriminated against him based upon his disabilities in violation of the Rehabilitation Act and the Americans with Disabilities Act. Specifically, they denied him reasonable accommodations for his COPD by denying him access to a wheelchair and portable oxygen tank, which prevented him from attending religious activities, the library and recreation. Both the ADA and Rehabilitation Act prohibit discrimination against an individual with a disability. Relief under these statutes "is coextensive" and "the analysis governing each statute is the same" except that the Rehabilitation Act includes an additional

10

element of receipt of federal funds. *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671 (7th Cir. 2012).

For the reasons explained below, when the summary judgment record is construed in the light most favorable to Mr. McIntosh it is obvious that he was discriminated against through the denial of reasonable accommodations for his disabilities. Given Mr. McIntosh's limitations, it defies reason to take away his wheelchair and portable oxygen tank, effectively tying him to his five foot long oxygen tube attached to his 45 pound oxygen concentrator for more than a year. The more complex question is who can be held liable for this misconduct.

IDOC argues that it is entitled to summary judgment because it is not responsible for the provision of medical equipment. Corizon argues that it is not a state entity and that it does not provide the services Mr. McIntosh was denied. In other words, the defendants argue that Mr. McIntosh was denied services, programs or activities provided by the IDOC, such as the library, church and recreation, and Corizon did not provide Mr. McIntosh with the tools necessary (wheelchair and portable oxygen tank) to participate in those activities, so neither is liable. The question this Entry seeks to answer is whether the ADA or Rehabilitation Act allows the recovery of money damages from either defendant under these circumstances. Mr. McIntosh is no longer incarcerated (the docket reflects he resides in an assisted living facility) so injunctive relief is not at issue.

## A. Corizon

Corizon argues that it is entitled to judgment as a matter of law because it is not a "public entity," which is an element of proving a claim under Title II of the ADA and because there is no evidence that it receives federal funds, which is an element of proving a claim under the

11

Rehabilitation Act. For the reasons explained below, this Court agrees.

*Title II of the ADA*

Title II of the ADA provides, in relevant part:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities **of a public entity**, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (emphasis added). Title II defines a "public entity" as "any State or local government, department, agency, special purpose district, or other instrumentality of a State or States or local government; and the National Railroad Passenger Corporation, and any commuter authority." 42 U.S.C. § 12131(1).

Corizon argues that it is a private medical contractor and not a "public entity" subject to liability under the ADA. *Green v. New York*, 465 F.3d 65, 78-79 (2d. Cir. 2006) (private hospital contracted by a municipality to provide medical care is not liable under Title II of the ADA); *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010) (holding that private prison management corporation which operated a Florida prison was "not a public entity merely because it contracts with a public entity to provide some service.").

This Court now concludes that Corizon, is not a "public entity" for purposes of the ADA. *See e.g., Stafford v. Wexford,* 2017 WL 4517506 (S.D. Ind. Oct. 10, 2017) (inmate with Hepatitis C was not permitted to sue Wexford under Title II of the ADA); *Knox v. Butler*, 2017 WL 476925, at *5 (S.D. Ill. Feb. 6, 2017) (disabled inmate was allegedly denied knee brace and low bunk permit making it impossible to access showers – court dismissed Wexford and allowed ADA and Rehabilitation Act claims to proceed against Illinois Department of Correction). Accordingly, Corizon is entitled to judgement as a matter of law on the ADA claim.

*Rehabilitation Act*

Corizon argues that it is also entitled to summary judgment on the Rehabilitation Act claim because it is not a federal government agency and Mr. McIntosh has not established that it receives federal funding. "The Rehabilitation Act, 29 U.S.C. § 701 et seq., applies to federal government agencies as well as organizations that receive federal funds." *Wisconsin Comm. Svcs., Inc. v. City of Milwaukee*, 465 F.3d 737, 746-47 (7th Cir. 2006). Corizon is not a federal government agency, but it is a private company providing medical services to prisoners.

Corizon argues that it is entitled to summary judgment because Mr. McIntosh has failed to present admissible evidence with regard to an essential element of a Rehabilitation Act claim. The Supreme Court has noted:

> In our view the plain language of rule 56(b) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986). Because there is no evidence to conclude that Corizon is a recipient of federal funds the Rehabilitation Act claim alleged against it is dismissed.

For these reasons, Corizon's motion for summary judgment, dkt [230], is **granted.** Corizon is entitled to judgment as a matter of law as to all claims alleged against it.

## B. Indiana Department of Correction

Unlike Corizon, IDOC is a public entity and receives federal funding. "In view of the

similarities between the relevant provisions of the ADA and the [Rehabilitation Act]," courts are instructed to "construe and apply them in a consistent manner." *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004).

Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Section 504 of the Rehabilitation Act, which applies to programs receiving federal financial assistance, states in relevant part: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794.

Given the fact that Mr. McIntosh (like all plaintiffs with similar claims) can have but one recovery it makes sense at this point to construe these claims together.[3] Having found that IDOC is an entity covered by both statutes, the remaining elements and potential recovery are the same. *See Jaros,* 684 F.3d at 672; *Kennington*, 2004 WL 2137652, at *7 (explaining that Title II of the ADA borrows remedies from the Rehabilitation Act and the Rehabilitation Act borrows remedies from Title VI of the Civil Rights Act of 1964 and as a result private individuals may not recover compensatory damages except where there is intentional discrimination).

---

[3] In many cases, the public entity is a state agency claiming sovereign immunity. Those cases have simply proceeded under the Rehabilitation Act to avoid the ADA's "thorny question of sovereign immunity," as applied to the State. *Jaros,* 684 F.3d at 672; *see also United States v. Georgia*, 546 U.S. 151 (2006) (discussing sovereign immunity analysis). The IDOC has not raised the issue of sovereign immunity in this case and it need not be addressed further.

*IDOC can be held liable for its Contractor's Misconduct*

IDOC argues that it is entitled to summary judgment because Corizon (and Corizon alone) was responsible for providing necessary medical equipment such as portable oxygen tanks and wheelchairs to IDOC inmates. It is mistaken.

The Tenth Circuit tackled a similar issue in *Phillips v. Tiona*, 508 F. App'x 737, 753–54 (10th Cir. 2013), and its analysis is instructive. The Tenth Circuit's analysis begins by pointing out that regulations issued by the Attorney General implementing Title II suggest that states may not avoid the responsibility to provide services to disabled prisoners by contracting away those obligations. The regulations require that: "A public entity in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, [discriminate against individuals with disabilities]." 28 C.F.R. § 35.130(b)(1). Pursuant to that regulation, public entities have been required to ensure that their contracts comply with the ADA. *See, e.g., Ivy v. Williams*, 781 F.3d 250, 257 (5th Cir. 2015) (explaining that a public entity can be liable for a private actor's behavior when there is a contractual or agency relationship, but not when the public entity simply licenses or regulates the private actor) (*citing Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013) (holding that state could be liable under ADA for inaccessibility of company it contracted with to provide state inmates with jobs); *Indep. Hous. Servs. of S.F. v. Fillmore Ctr. Assocs.*, 840 F. Supp. 1328, 1344 (N.D. Cal. 1993) (holding that "[t]he crucial distinction" that rendered the public entity liable for a private actor's inaccessibility was that the public entity "ha[d] contracted with [the private actor] for [it] to provide aid, benefits, or services to beneficiaries of the [public entity's] redevelopment program")). These regulations are entitled to deference. *Kennington v. Carter*, 2004 WL 2137652, at *4 (S.D. Ind. June 28, 2004) (J. Tinder)

(citing See 42 U.S.C. § 12134(a); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999) (the regulations implementing Title II "warrant respect")).

Thus, the Tenth Circuit explains, "[t]he remedy for violations of the regulation, and such conditions, is not to sue the jails for breach of contract under a third-party beneficiary theory, or for violations of the ADA, but to sue the state for failing to meet its own obligations under the ADA." *Phillips,* 508 F. App'x at 753–54 (*citing Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1069 (9th Cir. 2010)). Accordingly, Mr. McIntosh is entitled to the same accommodations for his disabilities regardless of whether the IDOC has contracted for the provision of medical treatment to a private entity.

*Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 169 (3d Cir. 2015), provides an illustration. In *Matthews*, the Third Circuit found that an inmate who had difficulty walking and navigating stairs stated an ADA and Rehabilitation Act claim against the Pennsylvania Department of Correction but not Corizon because Corizon is not a "public entity." The claim against the Pennsylvania Department of Correction was permitted to proceed because plaintiff alleged that he was placed in an upper-level cell that necessitated descending the stairs to access phones, dining hall, recreational activities, and religious services. These allegations suggested that plaintiff was deprived of public benefits that, with reasonable accommodation such as a lower bunk in a lower-tier cell, he would have been eligible to receive. These claims were permitted to proceed against the Pennsylvania Department of Correction even though its employees were justified in trusting the medical professionals employed by Corizon who regularly treated plaintiff and declined to recommend a bunk or cell reassignment. *Id.* at 170-171.

In summary, the IDOC may be liable for the ADA and Rehabilitation Act violations committed against Mr. McIntosh even if Corizon or its employees were responsible in whole or in part for the violations. *Estate of Rodriguez v. United States*, 2018 WL 388630, at *1 (6th Cir. Jan. 12, 2018) (noting that United States impleaded Correctional Corporation of America as a third-party defendant because it operated the private prison where prisoner plaintiff suffered injury).

*Qualified Individual with a Disability*

The IDOC argues that it is entitled to summary judgment because Mr. McIntosh is not a "qualified individual with a disability."

In response, Mr. McIntosh points out that IDOC's arguments are flawed because they rely on old case law and ignore the ADA Amendments Act of 2008 (ADAAA). Congress enacted the ADAAA in response to U.S. Supreme Court decisions that had "narrowed the broad scope of protection intended to be afforded by the ADA." 110 P.L. 325, 122 Stat. 3553. The defendants do not address this issue in their reply.

The ADA specifically defines the term "disability" in the statute. It means, "with respect to an individual – (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). A physical impairment includes "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). "Major life

activities" include both "breathing" and "walking." 42 U.S.C. § 12102(2)(A).

Mr. McIntosh has multiple physical impairments: COPD, emphysema and asthma and an anatomical loss (his lung). Mr. McIntosh's IDOC medical records and his testimony establish that his impairments substantially limit his ability to breathe and walk.

The IDOC's request for judgment as a matter of law on the basis that Mr. McIntosh is not a qualified individual with a disability is **denied.**

*Money Damages Available for Intentional Discrimination*

Mr. McIntosh seeks money damages in this action. To recover compensatory damages under both the ADA and Rehabilitation Act, a plaintiff must show intentional discrimination. *CTL ex. rel. Trebatoski v. Ashland School Dist.*, 743 F.3d, 524, 528, n. 4 (7th Cir. 2014). *See also United States v. Georgia*, 546 U.S. 151, 157 (2006) ("it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted 'exclusion from participation in or ... denial of the benefits of' the prison's 'services, programs, or activities.' " (quoting 42 U.S.C. § 12132)). IDOC was required "to reasonably accommodate a disabled person by making changes in rules, policies, practices or services as is necessary to provide that person with access…equal to that of those who are not disabled." *Good Shepherd Manor Found, Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003).

Although the Seventh Circuit has not decided "whether discriminatory animus or deliberate indifference is required to show intentional discrimination ... [m]ere negligence is insufficient under either standard, though." *Id.* at 512; *see also CTL ex rel. Trebatoski v. Ashland School Dist.*, 743 F.3d 524, 528 n. 4 (7th Cir. 2014) (noting the split among the circuits over the appropriate

standard for showing intentional discrimination but not needing to decide in this case). "The circuits that have rejected discriminatory animus and held that deliberate indifference is the proper standard to determine intentional discrimination 'have generally applied a two-part standard for deliberate indifference, requiring both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood.'" *Strominger v. Indiana Dep't of Correction*, 2017 WL 4236570, at \*4 (S.D. Ind. Sept. 25, 2017) (*quoting S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (internal quotations omitted)). Deliberate indifference in this context "must be a deliberate choice, rather than negligence or bureaucratic inaction." *Id.* (internal quotation omitted). *See also Kennington*, 2004 WL 2137652, at \*7 (noting that the Second, Ninth, and Tenth Circuits have held that the deliberate indifference standard applies, and that the parties have agreed that it should apply).

Accepting the evidence in the light most favorable to Mr. McIntosh, a reasonable jury could conclude that he was intentionally discriminated against and that the IDOC through its employees and agents was deliberately indifferent to the violation of Mr. McIntosh's federally protected rights resulting in harm. In particular, the record reflects that in an attempt to participate in the same programs, activities, and services that were offered to all other prisoners, Mr. McIntosh requested a portable oxygen tank and wheelchair. Given the fact that these accommodations were provided at the other facilities at which Mr. McIntosh was housed a reasonable jury could find that the requested accommodations were reasonable. Despite his requests, Mr. McIntosh did not receive a portable oxygen tank or wheelchair at Wabash Valley until approximately June or July 2014 (more than a year after his arrival on February 8, 2013). This claim is not based on medical malpractice, but on the failure to accommodate his disability.

IDOC (through its employees, agents or contractors) was aware of Mr. McIntosh's need for supplemental oxygen, and of his need for a portable oxygen tank and a wheelchair to move around the facility and access programming and services. For example, Mr. McIntosh testified that he would receive those items for temporary transport to and from the infirmary. A reasonable jury could infer from this fact that IDOC knew that Mr. McIntosh was not able to travel through the facility to the infirmary without these aids. Even though Mr. McIntosh received an oxygen concentrator, this was not a reasonable accommodation, because he was unable to easily move it and he could only take it to places where he could plug it into the wall immediately after moving it before his oxygen level was depleted. As a result, he was not able to use the oxygen concentrator to attend or participate in IDOC's programs, services, or activities. Mr. McIntosh properly utilized Wabash Valley's health care request and grievance processes to request the necessary accommodations.

IDOC through its employees, contractors and agents did not take any action to ensure that Mr. McIntosh was evaluated by a physician for purposes of receiving a portable oxygen tank and/or wheelchair in response to his repeated requests. There is no basis to conclude that a physician used his or her medical judgement to determine that Mr. McIntosh did not need a portable oxygen tank or wheelchair while at Wabash Valley. In addition, IDOC cannot escape liability by arguing that the Corizon employees are responsible for the failures to accommodate Mr. McIntosh. As discussed above, IDOC is liable for the acts of its agents including Corizon employees. *Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1048 (N.D. Cal. 2012) ("the public entity remains liable for the unlawful acts of its agent, even if that agent, a private entity, is not itself liable under Title II.").

For these reasons, genuine issues of material fact preclude summary judgment on Mr. McIntosh's claims for money damages under the ADA and Rehabilitation Act against the IDOC.

The ADA and Rehabilitation Act claims alleging intentional discrimination shall proceed against the IDOC. The IDOC's motion for summary judgment is **denied.**

## IV.
### Conclusion

Corizon's motion for summary judgment, dkt [230], is **granted**. No partial final judgment shall issue at this time as to the claims resolved in this Entry.

IDOC's motion for summary judgment, dkt [229] is **denied**. The ADA and Rehabilitation Act claims against IDOC shall be resolved either at trial or through settlement.

**IT IS SO ORDERED.**

Date: 3/23/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

MICHAEL MR. MCINTOSH
Oasis Assisted Living
5651 E. 30th Street
Indianapolis, IN 46218

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Jill Esenwein
INDIANA ATTORNEY GENERAL
jill.esenwein@atg.in.gov

Christopher S. Stake
DELANEY & DELANEY LLC
cstake@delaneylaw.net